**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**HARRISONBURG DIVISION**

| | |
|---|---|
| **In re:** | |
| | |
| **MICHAEL D. CHIDESTER,** | **Chapter 7** |
| | |
| | **Case No. 11-51591** |
| **Debtor.** | |
| | |
| **CINCINNATI INSURANCE CO.,** | |
| | |
| **Plaintiff,** | |
| | |
| **v.** | |
| | |
| | **Adversary Case No. 12-05008** |
| **MICHAEL D. CHIDESTER,** | |
| | |
| **Defendant.** | |

**MEMORANDUM OPINION**

Before the Court is Cincinnati Insurance Company's ("Cincinnati Insurance") renewed

motion for summary judgment, seeking a determination that a debt owed to it by Michael D.

Chidester is non-dischargeable as arising from Mr. Chidester's defalcation.  As more fully set

forth below, the Court grants Cincinnati Insurance's motion for summary judgment.

**FACTUAL AND PROCEDURAL HISTORY**

On November 13, 2013, the Court entered a memorandum decision which granted in part

and denied in part Cincinnati Insurance's first motion for summary judgment.[1]  In that opinion,

the Court concluded that Cincinnati Insurance was entitled to summary judgment regarding the

existence of a debt and the fact that the debt arose from Mr. Chidester's fiduciary relationship as

---

[1]      Mem. Op. Granting in Part & Den. in Part Pl.'s Mot. for Summ. J., ECF Doc. No. 62.  For an in-depth
discussion of the facts of this case, see Mem. Decision Den. Summ. J., ECF Doc. No. 28.

guardian for his stepfather, Billy Linwood Clemmer.[2]  The Court, however, found that a disputed

issue of material fact existed regarding Mr. Chidester's mental state.  The Court concluded that

Cincinnati Insurance was not entitled to summary judgment on the question of Mr. Chidester's

mental state in light of the Supreme Court's *Bullock* opinion.[3]  Specifically, the *Bullock* ruling

requires courts to find the debtor acted with at least recklessness to declare a debt

nondischargeable as arising from defalcation.[4]

Subsequently, Cincinnati Insurance renewed its motion for summary judgment, relying

primarily on the development of the case law since the *Bullock* decision and information gleaned

from a recent deposition of Mr. Chidester.[5]  Specifically, the renewed motion for summary

judgment highlighted portions of Mr. Chidester's deposition indicating he knew he needed to

account for Mr. Clemmer's funds but failed to do so.[6]  Furthermore, the motion pointed out that

Mr. Chidester received a letter from the Commissioner of Accounts informing him he had yet to

file the final accounting, but Mr. Chidester "ignored" the letter and did not inform the

Commissioner of either the disposition of the estate's assets or an explanation of his failure to

account.[7]  Accordingly, Cincinnati Insurance asserted the evidence before the Court was

sufficient to prove Mr. Chidester possessed the requisite scienter under the Supreme Court's

newly defined standard.

---

[2]     Mem. Op. Granting in Part and Den. in Part Pl.'s Mot. for Summ. J. at 7, ECF Doc. No. 62.

[3]     *Bullock v. BankChampaign, N.A.*, 133 S. Ct. 1754, 1759–60 (2013) (abrogating *Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806 (4th Cir. 2001)).

[4]     *Id.*

[5]     Mot. for Summ. J., ECF Doc. No. 70.

[6]     *See* Mem. of Law in Supp. of Pl. Cincinnati Insurance Company's Renewed Mot. for Summ. J. at 6–7, ECF Doc. No. 70-1.

[7]     *Id.* at 7–8.

In response to the renewed motion for summary judgment, Mr. Chidester asserted, "the record thus far does not establish that Mr. Chidester maintained a culpable state of mind . . . or that he committed defalcation through an intentional wrong or by engaging in reckless conduct."[8]

At the hearing on November 19, the parties appeared and presented their respective arguments. Counsel for Cincinnati Insurance began with a brief recitation of the facts, supplemented with testimony from Mr. Chidester's deposition, which she then asserted satisfied the *Bullock* standard.[9] Specifically, she pointed out that Mr. Chidester had legal representation in his appointment hearing; he filed two previous accountings, both of which the Commissioner of Accounts accepted; and he acknowledged an awareness of his obligations as conservator, yet he failed to meet them.[10] Moreover, in response to Mr. Chidester's anticipated excuses, counsel for Cincinnati Insurance argued that although he might not have had the documents in his immediate possession, he knew how much he had paid various individuals, remembered the names and locations of all of the nursing homes in which his stepfather resided, and could have gone to the bank to get his stepfather's account records, none of which he did.[11] Finally, Cincinnati Insurance's counsel stressed that Mr. Chidester knew he had failed to comply with his duties, because he received a notice from the Commissioner of Accounts informing him he needed to make a final accounting of his stepfather's estate, but Mr. Chidester admittedly "ignored" the correspondence.[12] Counsel then compared these facts to a handful of the litany of

---

[8]      Def.'s Resp. to Pl.'s Renewed Mot. for Summ. J. at 1, ECF Doc. No. 71.

[9]      Transcript at 5–6, ECF Doc. No. 74 [hereinafter *Transcript*].

[10]     *Id* at 3–4; *see also* Ex. A to Renewed Mot. for Summ. J. at 9–11, 13, 16, ECF Doc. No. 70-2 [hereinafter *Deposition*].

[11]     *Transcript*, *supra* note 9, at 8; *see also Deposition*, *supra* note 10, at 8–9, 11, 13–14.

[12]     *Transcript*, *supra* note 9, at 8; *see also Deposition*, *supra* note 10, at 10, 11, 15.

cases she had cited in her motion and, again, suggested the case was ripe for summary

judgment.[13]

Conversely, Mr. Chidester's counsel claimed the Supreme Court's ruling in *Bullock* was

stringent and required something akin to criminal recklessness or gross negligence.[14]  In

explaining why Mr. Chidester's conduct did not rise to the level of criminal recklessness, his

counsel argued that Mr. Chidester's failure to file the accounting was directly tied to his strained

relationship with his stepbrother who had control over a storage unit containing records Mr.

Chidester asserted he needed to complete the accounting.[15]  Furthermore, Mr. Chidester's

attorney emphasized that the record contains no evidence of improper conduct, fraud, or misuse

of funds, implying such a finding is necessary under the *Bullock* standard.[16]  Finally, he argued

that the Court should consider Mr. Chidester's lack of sophistication in legal matters as a

mitigating factor in his favor.[17]

Ultimately, counsel for Mr. Chidester conceded that Mr. Chidester did not file the

accounting and did not go "beyond" the records to attempt to procure other copies of the

documents to which is brother had denied him access.[18]  Nevertheless, he maintained that a

genuine issue of material fact existed as to whether Mr. Chidester's actions rose to the level of

"recklessness" as required by *Bullock*.[19]

---

[13]      *See Transcript*, *supra* note 9, at 8–17.

[14]      *Id.* at 19.

[15]      *Id.* at 20.

[16]      *Id.* at 20–21.

[17]      *Id.* at 21–22.

[18]      *See id.* at 19.

[19]      *See id.* at 24.

4

At the end of the hearing, the Court took under advisement the matter of Mr. Chidester's

*mens rea* with respect to his failure to account.[20]

### CONCLUSIONS OF LAW

a) *Summary Judgment*

Summary judgment is proper when there is "no genuine issue as to any material fact and .

. . the movant is entitled to judgment as a matter of law." *News & Observer Publ'g Co. v.*

*Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *see also* Fed. R. Bankr. P.

7056. A "material fact" is any one which may "affect the outcome of the case," and a "genuine

issue" exists as to any material fact "when the evidence would allow any reasonable juror to

return a verdict for the non-moving party." *News & Observer Publ'g Co.*, 597 F.3d at 576.

Furthermore, in making such a determination, courts should consider the non-moving party's

evidence as true and construe any reasonable inference in that party's favor. *Id.*

b) *Defalcation and the* Bullock *Standard*

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt arising from

"fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C.

§ 523(a)(4). Until the *Bullock* decision, the law surrounding defalcation varied greatly between

the Circuits—specifically with regard to scienter. *See Bullock*, 133 S. Ct. at 1759 ("[C]ourts of

appeals have long disagreed about the mental state that must accompany the bankruptcy-related

definition of 'defalcation.'").

Prior to the *Bullock* decision, courts agreed that to find a debt non-dischargeable as

arising from defalcation, the creditor had to show, by a preponderance of the evidence, two

things: (1) the debt arose while the debtor was acting in a fiduciary capacity, and (2) the debt

arose due to the debtor's violation of a fiduciary duty in such capacity. *See, e.g.*, *Kubota Tractor*

---

[20]      *Id.* at 31.

5

*Corp. v. Strack (In re Strack)*, 524 F.3d 493, 497 (4th Cir. 2008).  Disagreement remained,

however, regarding whether the debtor had to harbor any specific *mens rea* in breaching such a

fiduciary duty—be it an innocent mistake, intentional misconduct, or something in between.

*Compare Republic of Rwanda v. Uwimana (In re Uwimana)*, 274 F.3d 806, 811 (4th Cir. 2001)

(holding that for an action to be considered defalcation, it "need not 'rise to the level of

"embezzlement" or even "misappropriation"'" and, instead, mere "negligence or even an

innocent mistake which results in misappropriation or failure to account is sufficient." (citations

omitted)), *with Antlers Roof-Truss & Builders Supply v. Storie (In re Storie)*, 216 B.R. 283, 288

(B.A.P. 10th Cir. 1997) ("We conclude that 'defalcation' under section 523(a)(4) is a fiduciary-

debtor's failure to account for funds that have been entrusted to it due to any breach of a

fiduciary duty, whether intentional, willful, reckless, or negligent.").

Thus, the Supreme Court in *Bullock* sought to settle this disagreement and create a

uniform standard for bankruptcy courts across the country to apply when assessing the requisite

mental state a debtor must possess to commit defalcation.  Ultimately, the Supreme Court held

that in order for a court to determine a debt non-dischargeable due to defalcation, the debtor must

have committed an "intentional wrong"—a definition in which the Supreme Court explicitly

included conduct akin to criminal recklessness as defined by the Model Penal Code.  *Bullock*,

133 S. Ct. at 1759.  Specifically, Justice Breyer, writing for a unanimous Court, stated:

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other
> immoral conduct, the term requires an intentional wrong.  We include as
> intentional not only conduct that the fiduciary knows is improper but also reckless
> conduct of the kind that the criminal law often treats as the equivalent.  Thus, we
> include reckless conduct of the kind set forth in the Model Penal Code.  Where
> actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if
> the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and
> unjustifiable risk" that his conduct will turn out to violate a fiduciary duty.  That
> risk "must be of such a nature and degree that, considering the nature and purpose
> of the actor's conduct and the circumstances known to him, its disregard involves

6

a *gross deviation* from the standard of conduct that a law-abiding person would
observe in the actor's situation.

*Id.* at 1759–60 (emphasis in last sentence in original) (internal citations omitted).

Since the Supreme Court announced *Bullock*, a number of courts have applied this

heightened *mens rea* standard without any consensus about the proper mechanism and process

for implementing it.[21]  The United States Bankruptcy Court for the District of Colorado, in

*MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42 (Bankr. D. Colo. 2014), describes the varied

interpretations of *Bullock*, then dissects and thoroughly analyzes each individual element of the

Supreme Court's new *mens rea* requirement.  This Court agrees with the *Cupit* court's reasoning,

and, thus, the remainder of this analysis will track that opinion closely.

As mentioned above, the *Bullock* decision required the creditor seeking a determination

that a debt is non-dischargeable to prove by a preponderance of the evidence that the debtor's

actions rose to the level of an "intentional wrong," which includes "reckless" behavior as defined

by the Model Penal Code.  *Bullock*, 133 S. Ct. at 1759.  Accordingly, if the debtor does not

intentionally or knowingly commit a wrongful act resulting in the violation of the fiduciary duty,

the court must at least find that the debtor "consciously disregard[ed] a substantial and

unjustifiable risk" that the actions could result in such a violation.  Model Penal Code §

2.02(2)(c).

As discussed in the *Cupit* decision, importing the Model Penal Code's definition of

recklessness creates some confusion in this context, as criminal law *mens rea* standards generally

contemplate risks associated with potentially injurious consequences to others.  *See Cupit*, 514

B.R. at 50.  The Supreme Court, in *Bullock*, however, seemed to disclaim the idea that injury to

---

[21]        Although the *Bullock* opinion seems definitive, the application of this newly defined standard to actual
cases is not so simple, due to the Supreme Court's application of a criminal law mental state in an agency context.
For a thorough discussion of the implications and analysis of the Supreme Court's decision in *Bullock*, see generally
*MacArthur Co. v. Cupit (In re Cupit)*, 514 B.R. 42 (Bankr. D. Colo. 2014).

7

the beneficiaries was an element of defalcation.  *See Bullock*, 133 S. Ct. at 1759 ("In resolving

these differences, we note that this longstanding disagreement concerns state of mind, not

whether 'defalcation' can cover a trustee's failure (as here) to make a trust more than whole.  We

consequently shall assume without deciding that the statutory term is broad enough to cover the

latter type of conduct and answer only the 'state of mind' question.").  Thus, for defalcation, the

substantial and unjustifiable risk the debtor must consciously disregard is the risk the conduct

might violate a fiduciary duty, rather than that of a resultant injury, loss, or harm to the

beneficiary.  *Id.*

Moreover, as the *Cupit* court emphasized, the Model Penal Code's standard for

recklessness requires the court to consider whether the debtor's conduct was reckless from a

*subjective* point of view.  *Cupit*, 514 B.R. at 50.  "[T]o meet *Bullock*'s recklessness standard,

there must be evidence that the debtor was subjectively aware that his conduct might violate a

fiduciary duty."  *Id.*  Accordingly, evidence that the debtor *should have* been aware of the risk is

not sufficient to support a finding he or she acted recklessly under the *Bullock* standard, as "such

a finding would only support a finding of criminal negligence."[22]  *Id.*

Finally, the court must find that the risk the debtor consciously disregarded was

"substantial" and "unjustifiable."  *See* Model Penal Code § 2.02(2)(c).  Although the state courts

in Virginia have yet to define the terms "substantial" and "unjustifiable," other courts and the

Model Penal Code commentary suggest these terms entail an objective, reasonable person

assessment that the risk the actor disregarded is substantial and unjustified.[23]  *Cupit*, 514 B.R. at

---

[22]    The Supreme Court also expressly included within the definition of "recklessness" a debtor's "willful blindness" that her conduct might violate a fiduciary duty.  *See Bullock*, 133 S. Ct. at 1759.  This opinion, however, will not address this aspect of the *Bullock* decision, as it is inapposite in the case at bar.

[23]    Although relying on the reasonable person standard seems paradoxical based on the Court's previous statements about recklessness being a subjective determination, it is not.  In applying the *Bullock* standard, courts consider whether the debtor "consciously disregards" a risk from the debtor's subjective perspective, but in

8

52.  As the court in *Cupit* explained, "[w]hether a risk is substantial must be determined by

assessing both the likelihood that harm will occur and the magnitude of the harm should it occur

. . . . [W]hether a risk is unjustifiable must be determined by assessing the nature and purpose of

the actor's conduct relative to how substantial the risk is." *Id.* (quoting *People v. Hall*, 999 P.2d

207, 218 (Colo. 2000)).  Put differently, in this case, the Court would have to measure the

magnitude of the potential breach that may occur from Mr. Chidester's conduct when

considering whether the risked harm was substantial and unjustifiable.

This Court, once again, agrees with the reasoning of the *Cupit* court and will evaluate the

attendant risk from a reasonable person standard.  Indeed, an objective determination of the

magnitude and purpose of the risk seems to be the Supreme Court's intention in *Bullock*.  In

expounding upon how courts should assess the risks taken by the fiduciary, the Supreme Court

explained, "[t]hat risk 'must be of such a nature and degree that, considering the nature and

purpose of the actor's conduct and the circumstances known to him, its disregard involves a

gross deviation from the standard of conduct that a law-abiding person would observe in the

actor's situation.'" *Bullock*, 133 S. Ct. at 1760 (quoting Model Penal Code § 2.02(2)(c)).

   *c)  Mr. Chidester Acted Recklessly in Failing to Account*

With this understanding of the *Bullock* ruling, in the case at bar, the Court must assess

whether, construing all reasonable inferences in Mr. Chidester's favor, any genuine issue of

material fact exists regarding whether his actions were at least reckless in violating the fiduciary

duties he owed to his stepfather.  If the Court concludes that no reasonable juror could find that

Mr. Chidester was not (1) subjectively aware of his fiduciary duty, (2) conscious that he

disregarded a risk that his conduct breached his fiduciary duty, and (3) subjectively aware that

---

assessing the nature and magnitude of the risk, courts employ the reasonable person standard.  Thus, these two
statements are not inconsistent.

such risk was substantial and unreasonable, the Court should grant Cincinnati Insurance's motion

for summary judgment.  Based on the evidence in the record, and specifically Mr. Chidester's

testimony in his deposition, the Court finds that no reasonable juror could do so, and, thus, no

genuine issue exists that Mr. Chidester's conduct was at least reckless.

At the outset, the Court emphasizes that we do *not* find that Mr. Chidester *knowingly* or

*purposefully* violated his fiduciary duties, under the Model Penal Code standards.[24]  According

to the evidence in the record, the Court believes a rational juror *could* find that Mr. Chidester did

not purposefully or knowingly violate his fiduciary duties.[25]  Instead, the Court finds that the

evidence establishes that Mr. Chidester was subjectively aware of the substantial and

unreasonable risk that his failure to file the final accounting would violate a fiduciary duty, and

the Court does not believe a rational juror could find otherwise.  Furthermore, according to the

parties, none of the aforementioned facts would be in contention, if the case went to trial.[26]

---

[24]    As defined by the Model Penal Code, an individual acts "purposefully" with regards to a material element
of an offense when: (1) "if the element involves the nature of his conduct or a result thereof, it is his conscious
object to engage in conduct of that nature or to cause such a result," and (2) "if the element involves the attendant
circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist."  Model
Penal Code § 2.02(2)(a).

Similarly, a person acts "knowingly" regarding a material element of an offense when: (1) "if the element
involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or
that such circumstances exist," and (2) "if the element involves a result of his conduct, he is aware that it is
practically certain that his conduct will cause such a result."  *Id.* at § 2.02(2)(b).

In this case, there is no evidence to suggest Mr. Chidester intended to, or was substantially certain that his
actions would, violate his fiduciary duties owed to the estate.  Instead, the evidence only demonstrates his disregard
for the substantial risk that his conduct might violate a fiduciary duty.

[25]    The Court disclaims the idea that Mr. Chidester's knowledge of his duties alone, is sufficient to impute an
actual purposeful *mens rea* in this case.  Moreover, the Court rejects the argument that a debtor's "constructive
knowledge" of the fiduciary duties satisfies the *Bullock* standard.  As the court in *Cupit* opined, "simply imputing
knowledge of a statutory fiduciary duty will not suffice to establish recklessness . . . .  A debtor cannot *consciously*
disregard a risk of violating a fiduciary duty if he or she is wholly unaware of that duty."  *Cupit*, 514 B.R. at 51.

[26]    *See generally Transcript*, *supra* note 9, at 23–27 (explaining that at trial counsel would elicit more
testimony regarding Mr. Chidester's relationship with his stepbrother).

10

Specifically, the evidence shows that Mr. Chidester understood his responsibilities as conservator for his stepfather. First, Mr. Chidester testified that he was represented by counsel at his appointment hearing. *Deposition*, *supra* note 10, at 10, 16. Such representation suggests, and the Court has no reason to believe otherwise, that Mr. Chidester appreciated his duties as conservator and knew how to comply therewith. Similarly, as mentioned above, Mr. Chidester acknowledged multiple times that he knew he needed to file a final accounting with the Commissioner of Accounts. *See id.* at 9, 10, 11, 13, 16. He testified, "I had to . . . every so often I had to file a report with [the Commissioner of Accounts] showing them where . . . I had spent money and just like an itemized list of where money went." *Id.* at 10. Furthermore, he acknowledged that "every penny that [he] spent for Mr. Clemmer had to be accounted for with the Commissioner of Accounts." *Id.* at 13. Importantly, Mr. Chidester had, in fact, filed two prior accountings[27] with the Commissioner of Accounts—one dated September 27, 2005, and another dated June 28, 2006. Statement of Undisputed Facts at 2, ECF Doc. No. 18. The Commissioner accepted these accountings on October 17, 2005, and January 5, 2007, respectively. *Id.* at 20–44.

Finally, merely two months after filing the second accounting, on August 31, 2006, Mr. Chidester went to the court to request permission to sell his stepfather's house. *Id.* at 2. When questioned about how he knew he had to get permission to sell the house, Mr. Chidester stated, "The person that bought the house told me I had to do that." *Deposition*, *supra* note 10, at 7. Such uncontested and uncontroverted facts demonstrate that Mr. Chidester understood his responsibilities and duties as conservator and was able to comply therewith.

---

[27]    In his deposition, Mr. Chidester asserted multiple times that he had filed three prior accountings, *see Deposition*, *supra* note 10, at 9, 10, 11, but at the hearing, his attorney clarified that Mr. Chidester was confused, and he had actually only submitted two previous accountings. *See Transcript*, *supra* note 9, at 19–20

11

Furthermore, Mr. Chidester, at least superficially, understood that his duties were vitally important.  According to his testimony, he "would have been negligent and in a lot of trouble if [he] hadn't [filed the accountings.]"  *Id.* at 10.  Although he indicated in his deposition that he did not fully comprehend the purpose of the accountings, his testimony suggests that he did appreciate that the law required him to submit them.[28]  *See id.* at 14.  Finally, he admitted that he received a correspondence from the Office of the Commissioner of Accounts, yet he ignored it. *Id.* at 10, 11, 15.  Thus, Mr. Chidester understood the obligations his appointment entailed and, at least ostensibly, the importance thereof, and he was aware that he had yet to fully comply with these duties.  Nevertheless, he admitted that he ignored and consciously disregarded those responsibilities as well as any risk failing to comply with those responsibilities might occasion.

In attempting to explain his failure to make a final accounting of his stepfather's estate, Mr. Chidester made two claims.  First, he suggested he could not submit the final accounting for his stepfather's estate, because he did not have access to the information he needed to do so.  *Id.* at 6, 7, 9, 10, 11, 14.  Second, Mr. Chidester seemed to suggest that he thought his stepbrother's appointment as administrator of Mr. Clemmer's estate relieved him of his duties as conservator. *Id.* at 11.  Neither of these assertions, however, is sufficient to call into question Mr. Chidester's recklessness in failing to file the final accounting.

First, although Mr. Chidester claims he could not file the accounting due to losing access to his storage unit that contained all of the necessary information, such a suggestion does not raise any issues of his mental state and instead is exemplary of his recklessness.  Mr. Chidester testified in his deposition that when he returned to his storage unit, where he kept all of his

---

[28]    During his deposition, Mr. Chidester denied understanding that he was supposed to file the accountings to protect his father.  *Id.* at 14.  When pressed by counsel for Cincinnati Insurance about why he thought he needed to file the accountings, he responded, "[i]t was—it was what—it was their—it was what they were supposed to do." *Id.*  Counsel for Cincinnati Insurance then inquired, "It was the law?" to which Mr. Chidester responded, "I guess. Yes, ma'am." *Id.*

12

stepfather's records, his stepbrother had obtained access to it and placed a lock on it. *Id.* at 6, 7.

Instead of attempting to secure the records in another manner or contacting the Commissioner of

Accounts to inform him of his predicament, Mr. Chidester admits he did nothing.

Mr. Chidester explained that upon discovering the lock on the storage unit, he "didn't

know what to do" and felt like "his hands were tied." *Id.* at 11. The evidence, however, suggests

his hands were far from tied. Mr. Chidester acknowledged that he did not go to the bank to get

additional copies of Mr. Clemmer's account records, although he was also named on the account;

he testified that knew the names and locations of the nursing homes in which his stepfather

resided, yet he did not attempt to contact them for the relevant information; and he knew how

much he had paid himself, his wife, and his sister for their care of Mr. Clemmer, yet he did

nothing to report those amount to the Commissioner of Accounts. *Id.* at 8, 9, 11, 13, 14. Instead,

he merely stated, "I already had the majority of [those records in the filing cabinet.] No, I did

not go to the bank for anything else." *Id.* at 11–12. Thus, there were many other avenues Mr.

Chidester acknowledges he could have taken to attempt to comply with his duties as conservator.

Second, Mr. Chidester suggested that he believed he was absolved from his duties as

conservator upon his brother's appointment as administrator. *Id.* at 11. He testified, "I just kind

of, like, figured that it was out of my hands, because they basically—if I'm not mistaken, they

took—they took the conservatorship or whatever and the guardian thing away from me and gave

it to [my stepbrother]." *Id.* at 11. He did not explain what, if anything, he did to ensure his

duties were completely satisfied and his obligations honored or what he did after receiving notice

from the Office of the Commissioner of Accounts informing him of his failure to file the final

accounting.[29] Based on his knowledge and understanding of his responsibilities, Mr. Chidester's

---

[29]        Furthermore, this excuse seems tenuous based on the timeline of events. Mr. Chidester's stepbrother was
not appointed administrator of Mr. Clemmer's estate until November 2007; however, according the Virginia

failure to take any action constitutes at least a conscious disregard of a substantial risk that his actions would violate his fiduciary duties.

Ultimately, the evidence shows Mr. Chidester consciously disregarded a risk his actions could violate a fiduciary duty.  Based on his knowledge at the time the final accounting was due, Mr. Chidester knew he had to make some kind of accounting, since he had submitted two prior accountings.  *Id.* at 9–11, 16.  Furthermore, Mr. Chidester acknowledged that he had received a correspondence from the Commissioner of Accounts, informing him that he had yet to file the final accounting.  *Id.* at 10, 11, 15.   Finally, Mr. Chidester admitted he knew that not filing the accounting was wrong and he would be in trouble for not doing it, but he readily admits that he did not do so.  *Id.* at 10.  Thus, Mr. Chidester was subjectively aware of his duties and that there was at least a possibility—i.e., a risk—that failing to file the accountings would violate his fiduciary duties, and he consciously disregarded that risk.

Next, no reasonable juror could find that the risk Mr. Chidester disregarded was not substantial and unjustified.  As mentioned above, to determine whether a risk is substantial, the Court should consider the objective probability of harm resulting from the conduct and the potential magnitude of that harm.  *See Cupit*, 514 B.R. at 52.  Based on the information before Mr. Chidester, there was a considerable risk that his failing to act would violate a fiduciary duty. No information before Mr. Chidester suggested he was relieved from fulfilling his fiduciary duties, and he even received a correspondence from the Commissioner of Accounts informing him he had yet to file the final accounting.  *See Deposition*, *supra* note 10, at 10, 11.  Even considering Mr. Chidester's argument that he believed his brother's position as administrator of

---

statutory accounting requirements and Mr. Chidester's past practices, this appointment was after Mr. Chidester should have filed, and normally did file, his accountings.

14

his stepfather's estate relieved him of his duties, there was still an appreciable risk that Mr.

Chidester still had some obligations remaining.[30]

Regarding the magnitude of the potential harm that might result from Mr. Chidester's

conduct, the only relevant harm that could result in this case is an intangible one—the violation

of a fiduciary duty. Although the concept of fiduciary duties is an amorphous one to many

individuals outside of the legal field, the evidence demonstrates that Mr. Chidester understood

the importance of his duties as conservator. At various points in his deposition, he

acknowledged that he would be in trouble if he did not comply with his duties and that it was the

law that he do so. *See id.* at 10, 14. Thus, the risk of violating a fiduciary duty was substantial

and one that Mr. Chidester understood.

Finally, the Court must consider whether Mr. Chidester's conduct breaching his fiduciary

duties was "justified." In doing so, the Court must consider Mr. Chidester's actual conduct in

light of the magnitude of the harm risked. *See Cupit*, 514 B.R. at 52. Once again, Mr. Chidester

admitted in his deposition that he could have collected the information for the final accounting

from other sources, but he did not. *Deposition*, *supra* note 10, at 8, 9, 11, 13, 14. Such a failure

to act, when the necessary information could be relatively easily procured with minimal effort,

cannot justify a violation of fiduciary duty.[31] Thus, in light of the knowledge Mr. Chidester

possessed and based on his understanding of his responsibilities at the time, the Court holds that

---

[30]    Moreover, a non-moving party's mere denials are not sufficient to create a "genuine issue of material fact" at the summary judgment stage. *See News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).

[31]    Other courts that have considered the question of justification scrutinize the purpose and potential benefit to the beneficiary of the actual conduct of the actor, such as a risky investment. *See, e.g.*, *Fogg v. Pearl (In re Pearl)*, 502 B.R. 429, 436 (Bankr. E.D. Pa. 2013) (acknowledging the debtor's justification in investing in real estate for an incapacitated individual's estate). In Mr. Chidester's case, however, failing to file an accounting cannot ever benefit the estate, so, instead, the Court considers the actions Mr. Chidester *actually* took to comply with his duties.

15

no reasonable juror could find that such conduct does not constitute a gross deviation from the

standard of conduct that a law-abiding person would observe.  *See Bullock*, 133 S. Ct. at 1759.

**CONCLUSION**

The Court **GRANTS** Cincinnati Insurance's renewed motion for summary judgment and

holds that Mr. Chidester committed defalcation, as defined in Bankruptcy Code section 523(a)(4)

and the Supreme Court's *Bullock v. BankChampaign, N.A.* decision.  Ultimately, the Court finds

that Cincinnati Insurance has carried its burden in proving that there exists no issue of material

fact, and no reasonable juror could find, that Mr. Chidester did not act at least recklessly in

failing to account.  Accordingly, the Court grants the motion for summary judgment and finds

the debt Mr. Chidester owes to Cincinnati Insurance non-dischargeable as arising from his

defalcation.

The Court will contemporaneously issue an order consistent with the findings and ruling

of this opinion.

Date Entered:  January 28, 2015

_____

Rebecca B. Connelly
United States Bankruptcy Judge

16